# IN THE COURT OF APPEALS OF IOWA

No. 21-1631
Filed February 8, 2023

IN RE THE MARRIAGE OF SUE A. BLOOMQUIST
AND ROBERT L. BLOOMQUIST

Upon the Petition of
SUE A. BLOOMQUIST,
        Petitioner-Appellee,

And Concerning
ROBERT L. BLOOMQUIST,
        Respondent-Appellant.

_____

        Appeal from the Iowa District Court for Polk County, Jeanie Vaudt, Judge.


        Robert Bloomquist appeals from a dissolution decree.  **AFFIRMED AS MODIFIED.**


        Matthew G. Sease of Sease & Wadding, Des Moines, and Roger J. Hudson II of R.J. Hudson Law Firm, P.C., West Des Moines, for appellant.

        Kent A. Balduchi of Balduchi Law Office, Des Moines, for appellee.


        Considered by Ahlers, P.J., and Badding and Chicchelly, JJ.

**AHLERS, Presiding Judge.**

After forty-two years, Robert and Sue Bloomquist's marriage was dissolved by the district court's decree following trial. Robert appeals. He claims the property division was inequitable, he was awarded insufficient spousal support, and he should have been awarded trial attorney fees. He also seeks appellate attorney fees. Sue responds by asking that the decree remain unchanged and that she be awarded appellate attorney fees.

## I.    Background[1]

The parties married in 1978. They have two adult children. At the time of trial, Robert was seventy-one years old and had been retired for about ten years. Sue was sixty-three years old, and she was still working for her employer of forty-two years. Both parties had accumulated retirement funds as well as an assortment of other assets and debts.

Following trial, the district court divided the parties' property. As part of the division, Robert received the house and responsibility for the mortgage indebtedness, with the direction that he remove Sue from the mortgage indebtedness or sell the house. The court also awarded each party the retirement funds in that party's name. However, the court also ordered that $100,000 of Sue's retirement accounts be transferred from Sue's accounts to Robert via a qualified domestic relations order (QDRO) and that her pension be divided equally using

---

[1] While several issues were disputed at trial, the number of issues has been trimmed on appeal. So, we highlight only those portions of the district court's ruling that remain or influence issues on appeal.

the *Benson* formula. *See In re Marriage of Benson*, 545 N.W.2d 252, 255–56 (Iowa 1996) (providing a formula for dividing defined benefit plans).

The court also ordered Sue to pay Robert spousal support of $1000 per month "until Sue retires in two years or until her death, or until Robert remarries, whichever event first occurs." The court declined to order either party to pay any of the other party's attorney fees.

As noted, Robert raises three issues on appeal. We address each in turn.

## II.     Standards of Review

We review dissolution-of-marriage proceedings de novo. *In re Marriage of McDermott*, 827 N.W.2d 671, 676 (Iowa 2013). We examine the record and determine anew property distribution. *Id.* We give weight to, but are not bound by, the findings of the district court and only disturb its ruling when it fails to achieve equity. *Id.*

Like property division, we review issues of spousal support de novo, but "we accord the trial court considerable latitude." *In re Marriage of Gust*, 858 N.W.2d 402, 406 (Iowa 2015) (quoting *In re Marriage of Olson*, 705 N.W.2d 312, 315 (Iowa 2005)). We only disturb the district court's ruling if it fails to do equity. *Id.*

We review the decision to award or not award trial attorney fees in dissolution actions for an abuse of discretion. *In re Marriage of Sullins*, 715 N.W.2d 242, 255 (Iowa 2006).

## III.    Property Division

In Iowa, property is to be divided equitably at the time of dissolution. *In re Marriage of Miller*, 966 N.W.2d 630, 635 (Iowa 2021). We determine what is equitable by considering the factors listed in Iowa Code section 598.21(5) (2020).

*Id.* Equitable division of property does not require property be divided equally, although equal division is often most equitable. *In re Marriage of Kimbro*, 826 N.W.2d 696, 703–04 (Iowa 2013).

A key property-division issue in this case surrounds the value of Robert's individual retirement account (IRA). There were competing themes on this issue at trial. Robert's theme was that the IRA should be valued at the balance remaining at the time of trial, which was just over $11,000. Sue's theme was that the IRA should be valued at the balance the account had when Robert retired, although she did not know what that balance was. The district court seemed to accept Sue's theme by rejecting Robert's, but, in doing so, the court did not make specific findings of value or how the value affected the property division. On appeal, Robert contends the property division is inequitable because the total marital net worth of the parties was not equally valued when the IRA is valued at its time-of-trial balance. Before getting to the merits of this issue, we first address a discovery issue because it is intertwined with the property-division issue.

## A. The Discovery Issue

Fairly early in the case, Sue sent discovery requests to Robert asking for documentation about various assets and debts, including his retirement accounts. As to the retirement account documentation, Robert responded, through counsel,[2] that the answer would be supplemented when the documents were received. Robert never fully complied with his obligation to provide that documentation.

---

[2] The attorney representing Robert at the time of the discovery request is not the same attorney who represented him at trial or on appeal.

Sue never filed a motion to compel, a motion for sanctions, or any other motion seeking court assistance in gaining compliance with the discovery requests. Instead, after the close of the clerk's office on the night before trial, she filed a motion seeking to preclude Robert from introducing any evidence on any issue covered by her discovery requests that were not fully answered. Although captioned as a motion in limine and objection to trial exhibits, the body of the motion mentioned sanctions as a basis for granting the requested relief.[3]

The court did not grant Sue's motion and received all testimony and exhibits offered at trial subject to Sue's objections that repeated those made in her motion. The evidence, admitted subject to Sue's objection, included testimony and exhibits about Robert's IRA value.

While not expressly excluding any evidence or imposing any sanctions, the court instead found Robert not credible because of his failure to provide discovery

---

[3] There is little doubt that Robert failed to fully comply with discovery requests. There is also little doubt that Sue had tools available to try to force Robert's compliance. *See* Iowa R. Civ. P. 1.517 (permitting a party to compel discovery, and providing for sanctions to be imposed if the party to which discovery requests were made does not comply). She did not utilize those tools, choosing instead to wait until the eve of trial to request a severe sanction, specifically the exclusion of evidence. While we do not condone Robert's failure to fully comply, we also do not condone Sue's actions of not using tools available to her to gain compliance before seeking such a severe sanction. There is authority that discovery sanctions can be imposed without an order compelling discovery. *See, e.g.*, *Lawson v. Kurtzhals*, 792 N.W.2d 251, 258 (Iowa 2010) (noting the inherent authority of courts to exclude evidence for failure to comply with discovery requests). However, we do not interpret this authority as stating a preference for using inherent authority to exclude evidence instead of the procedure provided in our rules of civil procedure. We suggest that the preferred course would be for a party aggrieved by token discovery responses to follow the progressive steps provided in our rules of seeking supplementation via informal requests followed by motions to compel and motions for sanctions, if necessary, rather than bypassing those steps and going straight for the harsh remedy of exclusion.

documentation.  It is not clear how this impacted the court's valuation of assets as it relates to property division, as specific findings about values based on the credibility findings were not made.

### B.    The Outcome

On our de novo review, we find the district court's division of property to be inequitable for a number of reasons.  First, as noted, the court did not determine a specific value for Robert's IRA different from the undisputed balance at the time of trial.  Without a finding of an alternative value and an explanation of how it impacted the property division, there is no support for the unequal division ordered by the court.  *See In re Marriage of Keener*, 728 N.W.2d 188, 193 (Iowa 2007) (holding that assets should be valued as of the date of trial).

Second, this is not a credibility issue wherein one party is attempting to hide the real value of an asset.  *Cf. In re Marriage of Williams*, 421 N.W.2d 160, 167 (Iowa Ct. App. 1988) (considering spouse's secretion of assets and evasive and dishonest disregard of the discovery process in making an unequal distribution of marital property).  There was no dispute that Robert continued to pay his share of the marital expenses, including a significant mortgage payment, and his only meaningful sources of funds were his Social Security benefits and IRA.  Sue knew Robert was using his IRA to pay household bills pursuant to their longstanding agreement for division of household bills.  After ten years of retirement, it is not surprising that his IRA balance would continue to fall as he tapped it to pay living expenses, and, while Robert's tax returns show a bump up in his IRA distributions during the 2020 tax year (the year the dissolution proceeding was started), it is not

a bump that would be unexpected given the split between the parties and the hiring of attorneys.

Third, the district court essentially adopted Sue's insinuation that Robert dissipated assets. The dissipation doctrine applies to situations in which a spouse, during the period of separation, engages in conduct that results in the loss of property otherwise subject to division. *Kimbro*, 826 N.W.2d at 700–01. The evidence does not support a claim of dissipation. To begin with, there is no evidence that Robert made significant expenditures during the period of separation. There is only evidence of expenditures made since Robert retired ten years ago, not since the parties separated. The dissipation doctrine does not apply to these regular pre-separation expenses. *Id.* (applying the dissipation doctrine only to conduct "during the period of separation"). We imagine that many spouses—whether still married or going through a divorce—are disgruntled with their partners' spending habits, but, if they divorce, we generally do not look back to try to account for past spending. Instead, we simply divide up what's left because marriage does not come with a ledger. *See Miller*, 966 N.W.2d at 633 ("When things are going well, married folks pay little attention to whose stuff is whose or how it ended up in the marital pot. But when things go south, there is an intense laser focused on the marital pot."); *In re Marriage of Fennelly*, 737 N.W.2d 97, 103–04 (Iowa 2007) ("It is important to remember marriage does not come with a ledger. . . . Each person's total contributions to the marriage cannot be reduced to a dollar amount." (internal citation omitted)); *In re Marriage of Briggs*, 225 N.W.2d 911, 913 (Iowa 1975) ("Husband and wife need not, during happy days, keep a ledger to prove his or her economic value should the marriage later

founder."). Robert's purchase of camera equipment, drones, and other hobby items since he retired does not trigger the dissipation doctrine when there is no persuasive evidence that these events occurred post-separation, and the expenditures are not out of line for a person partaking in the rewards of retirement.

For all of these reasons, we find it equitable to value all assets, including Robert's IRA, at the time of trial rather than making calculations built on some unspecified, fictitious, higher figure.

As for liabilities, however, we have a different take on the issue of dissipation. Robert claimed credit card debt totaling over $14,000, while Sue had around $2000 of such debt. Unlike the spend down of Robert's IRA, which was known to both parties and part of their agreement for division of household expenses, there was no persuasive evidence that Robert routinely carried $14,000 of credit card debt or why it bubbled up so high by the time of trial. We give Robert the benefit of the doubt on the spend down of his IRA because the decline in the IRA balance is consistent with him keeping up with his share of the expenses. We give no such benefit of the doubt to his ballooning credit card debt. With no explanation or evidence backing up the need for this debt, we find that Robert engaged in dissipation by incurring unexplained debt in excess of a routine amount. *See Fennelly*, 737 N.W.2d at 104–05 (holding that unexplained debt is a form of dissipation, as marital assets would be needed to repay the debt). Viewing Sue's credit card debt as a benchmark of routine debt for these parties, we find it equitable to make Robert responsible for all of his credit card debt but to only give him credit for an amount comparable to the credit card debt carried by Sue.

We adopt the district court's division of the assets and debts, but we place values on each asset or debt as indicated in the following recapitulation statement, which incorporates our findings of values based on the record as well as the valuation determinations previously discussed:[4]

| Description of Asset/Debt | Sue | Robert |
|---|---|---|
| Sue—Pension | Equal[5] | Equal |
| Sue—Fidelity Rollover IRA | $134,504 | |
| Sue—Prudential 401(k) | $299,755 | |
| Robert—IRA | | $11,352 |
| House | | $271,000 |
| House mortgage | | ($205,055) |
| Sue—Checking Account | $1,460 | |
| Sue—Savings Account | $4,700 | |
| Robert—Checking Account | | $1,661 |
| Robert—Savings Account | | $300 |
| Robert—Pen Fed Account | | $30 |
| Sue—Citi Card Credit Card | ($1,626) | |
| Sue—Mastercard Credit Card | ($157) | |
| Sue—Visa Credit Card | ($198) | |
| Robert—Total of Three Credit Cards | | ($1,980)[6] |
| Robert—Medical Bills | | ($2,000) |
| | | |
| Total | $438,438 | $75,308 |

As shown by the above statement, the division of assets and debts results in a large discrepancy in Sue's favor. We find this case to be one in which

[4] This recapitulation statement accounts for the division of Sue's pension ordered by the district court, but it does not account for the $100,000 equalization payment ordered to be effectuated by QDRO, as we want the statement to show the starting point before an equalization payment is calculated.

[5] The marital portion of Sue's pension was divided equally using the *Benson* formula, so we need not place a value on this equally divided asset.

[6] Robert remains responsible for all credit card debt in his name, including his credit cards with Wells Fargo, Discover, and Bank of America. Although the balances of the Wells Fargo, Discover, and Bank of America cards total approximately $14,000.00, as previously noted, Robert will only be given credit for balances of approximately the same amount as Sue's credit card debt (i.e., $1980).

equitable division of marital property can be accomplished by nearly equal division. *See McDermott*, 827 N.W.2d at 682 (noting that, while equitable division does not always require equality, "[e]quality is, however, often most equitable; therefore, we have repeatedly insisted upon the equal or nearly equal division of marital assets"). In order to accomplish nearly equal division, Robert is awarded $181,565 of Sue's IRA or 401(k), with such division occurring by entry of one or more QDROs. This will generally equalize the parties' resulting net worths. It will be Sue's choice as to whether the equalization payment comes from her IRA, her 401(k), or both. The equalization payment of $181,565 of retirement funds replaces the district court's order for a $100,000 payment, so, if Sue has already transferred any of the $100,000 required by the district court's decree, only such amount as necessary to reach a total amount of $181,565 needs to be transferred by QDRO.

## IV. Spousal Support

Robert was awarded spousal support of $1000 per month "until Sue retires in two years or until her death, or until Robert remarries, whichever event first occurs." Robert challenges this award, contending he should receive $1500 per month until the first to occur of his death, Sue's death, or his remarriage.

Iowa Code section 598.21A(1) lists the factors to consider in determining a spousal support award. The district court considered these factors in determining the award amount and duration, especially focusing on earning capacity. As to earning capacity, the district court highlighted the fact that Sue has plans to retire in two years, and Robert is already retired. This was a driving consideration in the court's award of spousal support. Our case law generally requires retirement be addressed by a modification action rather than impacting the original determination

of spousal support. *See Gust*, 858 N.W.2d at 418. However, when retirement is imminent the court may address retirement in an initial spousal support determination. *See id.* In this case, because Sue's retirement is imminent, the district court properly considered Sue's upcoming retirement earning capacity in determining spousal support. *See id.* (noting that the issue of retirement of the payor should be addressed by modification, except "when retirement is imminent or has actually occurred"). The court correctly concluded that Sue's income will significantly decrease when she retires. Also, the court considered the large part of Sue's retirement funds Robert will receive in the property division—a portion we substantially increase in this ruling. Given the earning capacity of the parties over the course of the marriage, Sue's imminent retirement, and the generally equal division of property, we find the district court's award of spousal support to be equitable, and we decline to change it.

## V. Trial Attorney Fees

Robert challenges the district court's decision not to order Sue to pay his attorney fees. "Whether attorney fees should be awarded depends on the respective abilities of the parties to pay." *Sullins*, 715 N.W.2d at 255 (quoting *In re Marriage of Guyer*, 522 N.W.2d 818, 822 (Iowa 1994)). The district court determined Robert should not receive attorney fees. As the parties' ability to pay has been largely equalized by the property division and spousal support determinations, we find no abuse of discretion by the district court and affirm its decision not to require Sue to pay Robert's trial attorney fees.

**VI.	Appellate Attorney Fees**

Both Sue and Robert ask us to award appellate attorney fees.  Appellate attorney fees are not awarded as a matter of right in dissolution actions but rest in the appellate court's discretion.  *Id.*  To determine if appellate attorney fees are appropriate, we consider multiple factors, including the merits of the appeal, the needs of the party asking for fees, and the ability of the other party to pay.  *Id.*  Here, although Robert was partially successful on appeal, the parties' abilities to pay are generally equal, so we decline both parties' requests for appellate attorney fees.

**VII.	Conclusion**

The district court ordered an equalization payment of $100,000 to be transferred from Sue's retirement account(s) to Robert via QDRO.  We modify the equalization payment by increasing it to $181,565.  We affirm all other terms of the district court's decree, including the spousal support award to Robert and the declination of Robert's request for trial attorney fees.  Both parties' requests for appellate attorney fees are denied.  Costs of appeal are assessed equally between the parties.

**AFFIRMED AS MODIFIED.**